RICHARDUNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD SAVOY, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>    -against-<br><br>BOSTON PRIVATE FINANCIAL HOLDINGS, INC., ANTHONY DECHELLIS, STEPHEN M. WATERS, MARK F. FURLONG, JOSEPH C. GUYAUX, DEBORAH F. KUENSTNER, GLORIA C. LARSON, LIZABETH H. ZLATKUS, LUIS A. UBINAS, and KIMBERLY S. STEVENSON,<br><br>          Defendants. | Case No.: 1:21-cv-11537<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934** |

Plaintiff, by Plaintiff's undersigned attorneys, for this complaint against Defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel and review of publicly available sources, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.    Plaintiff brings this action as a class action on behalf of himself and all similarly situated former public shareholders of Boston Private Financial Holdings, Inc. ("Boston Private" or the "Company"), against Boston Private, the Company's former Chief Executive Officer Anthony DeChellis ("DeChellis"), and the former members of the Company's Board of Directors (the "Board," and collectively with DeChellis, the "Individual Defendants") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.

2.    Plaintiff's claims arise in connection with the merger between Boston Private and SVB Financial Group, Inc. ("SVB"), which was obtained by Defendants using false and materially misleading proxy solicitations that concealed incoming interest in alternative deals by prime merger partners,

misrepresented a highly cautionary report on the merger by a third party proxy advisor, misdirected shareholders about aspects of the merger that failed to maximize shareholder value, and misrepresented the Board's lack of belief in the proposed transaction's worth.

3.     On January 4, 2021, Boston Private and SVB entered into an agreement and plan of merger (the "Merger Agreement"), pursuant to which Boston Private would merge into SVB, with SVB continuing as the surviving corporate entity. The consideration Defendants negotiated per share of Boston Private amounted to $2.10 in cash (the "Cash Consideration") and 0.0228 shares of SVB Financial common stock (the "Exchange Ratio") (together, the "Merger Consideration"), which was worth a mere $10.94 as of December 31, 2020, the last trading day before the announcement of the merger. In January 2020, prior to the stock market drop caused by the pandemic, Boston Private shares had traded in the range of $12 per share.

4.     Following the announcement of the Merger and the initiation of a proxy fight by Boston Private's fourth largest shareholder, "HoldCo,"[1] Boston Private released a series of materially false and misleading proxy solicitations to suppress shareholder opposition and consolidate support for a deal. Boston Private's proxy solicitations contained, *inter alia*, the following materially false and misleading statements:

I.     That DeChellis and Boston Private had closed the door on incoming interest from the CEO of First Foundation Wealth Management ("First Foundation"), because "Boston Private had previously determined that such a transaction would not be financially attractive or create meaningful value for Boston Private shareholders, and that this company was not a strong financial, cultural, or strategic fit for Boston Private [and that] [a]ccordingly there was no reason to engage in further discussions . . . ." Boston Private Shareholder Letter & Proxy Solicitation, p. 4 (Apr. 7, 2021)

II.    That First Foundation's "apparent interest was in being acquired by Boston Private," rather than interest in a dialogue about a merger. (*Id.*)

III.   That "no . . . institution, other than SVB Financial, ever submitted a proposal regarding a potential acquisition or strategic business combination to Boston Private." Boston Private Definitive Proxy, p. 61 (Mar. 18, 2021)

IV.    That the independent proxy advisory company Institutional

---

[1] HoldCo Asset Management, LP, owner of approximately 4.9% of Boston Private.

Shareholder Services had "recommend[ed] that Boston Private shareholders support the recommendation of [Boston Private's] Board and vote in favor of the merger with SVB Financial." Boston Private Press Release & Proxy Solicitation (Apr. 14, 2021)

V. That ISS's report "underscore[d] that the transaction with SVB Financial [was] financially and strategically compelling and provide[d] the best path for maximizing value for Boston Private shareholders." (*Id.*)

VI. That "[t]he Board negotiated to increase the value of the merger consideration from approximately $7.60 per Boston Private share to $10.94 per Boston Private share at the date of announcement of the transaction[.]" Boston Private Shareholder Letter & Proxy Solicitation, p. 4 (Apr. 7, 2021)

VII. That the merger provided shareholders a "compelling premium" that had "substantially increased since [December 31, 2020] as a result of the appreciation of SVB Financial's share price, […] corresponding to a 56% premium to Boston Private's unaffected share price as of immediately prior to announcement[.]" (*Id.*)

VIII. That "[t]he Board believe[d] that the transaction with SVB Financial provide[d] substantially higher and more certain value to Boston Private shareholders than the company's available alternatives." (*Id.*).

5.   As set forth below, Defendants caused or allowed these materially false and misleading statements to be disseminated to shareholders because control over the Company's merger strategy had been captured by DeChellis, who was conflicted because he had secured a high-profile post-merger role for himself as the senior executive in charge of SVB's wealth management business. In that role, DeChellis's total compensation was slated to more than double – from $2.19 million to over $5 million – and the value of his equity award would increase by more than 300%, from $1.1 million to $3.5 million. The two further people on Boston Private's merger working group were directors who lacked enough "skin in the game" to keep DeChellis' in check, much less prevent him from selling Boston Private for a bargain in exchange for substantial personal gain.

6.   On May 4, 2021 – after the adjournment of the initial shareholder vote[2] – a majority of

[2] *Boston Private to Make Second Attempt at Investor Approval for SVB deal*, Jim Dobbs (American Banker) (May 3, 2021) (americanbanker.com/news/boston-private-to-make-second-attempt-at-investor-approval-for-svb-deal)

Boston Private's shareholders voted to approve the unfair merger as a direct result of the Company's false and misleading statements. The Company's materially false and misleading proxy solicitations were an essential link in the consummation of the merger, which closed on July 1, 2021, because the shareholder vote could not have occurred without the dissemination of the definitive proxy, and the April 7 and April 14, 2021 releases by Boston Private were an essential link because of the key role they played in undermining shareholder opposition to the deal.

7.     For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, Rule 14a-9, and further applicable law.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1331 because the claims asserted arise under Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

9.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.

## PARTIES

11.     Plaintiff was, and was continuously at all relevant times, the owner of Boston Private common stock.

12.     Defendant Boston Private Financial Holdings, Inc. was a Massachusetts corporation headquartered in Boston, Massachusetts. Boston Private's common stock traded on the Nasdaq under the ticker symbol "BPFH."

13.     Defendant Anthony DeChellis ("DeChellis") was, and was at all relevant times, the Company's Chief Executive Officer and a director of the Company.

14.     Defendant Stephen M. Waters ("Waters") was, and was at all relevant times, the Chairman of the Board of Directors of the Company.

15.     Defendant Mark F. Furlong ("Furlong") was, and was at all relevant times, a director of the Company.

16.     Defendant Joseph C. Guyaux ("Guyaux") was, and was at all relevant times, a director of the Company.

17.     Defendant Deborah F. Kuenstner ("Kuenstner") was, and was at all relevant times, a director of the Company.

18.     Defendant Gloria C. Larson ("Larson") was, and was at all relevant times, a director of the Company.

19.     Defendant Kimberly S. Stevenson ("Stevenson") was, and was at all relevant times, a director of the Company.

20.     Defendant Luis A. Ubinas ("Ubinas") was, and was at all relevant times, a director of the Company.

21.     Defendant Lizabeth H. Zlatkus ("Zlatkus"), was, and was at all relevant times, a director of the Company.

22.     The Defendants identified in paragraphs 12 through 21 are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**I.     Boston Private's Business Background and Positive Financial Outlook Prior to the Announcement of the Merger.**

23.     Boston Private was a publicly traded Massachusetts corporation headquartered in Boston, Massachusetts that offered a full range of banking and wealth management services to high net worth individuals, families, businesses, and select institutions. The company was founded in 1983, employed approximately 800 people, and had two reportable business segments: Private Banking, and Wealth Management & Trust. The Company's stock traded under the ticker symbol "BPFH."

24.     The Company's "Private Banking" segment consisted of the banking operations of Boston Private Bank, a wholly-owned subsidiary of Boston Private that primarily operated in the geographic markets of New England, Northern California, and Southern California. The segment was principally engaged in providing banking services to high net worth individuals, privately-owned businesses, and nonprofit organizations. Boston Private's Private Banking segment was also an active provider of financing for affordable housing, first-time homebuyers, economic development, social services, community revitalization, and small businesses.

25.     The "Wealth Management and Trust" segment was comprised of Boston Private Wealth LLC, a registered investment adviser and wholly owned subsidiary of Boston Private Bank, and the trust operations of Boston Private Bank. The Wealth Management and Trust segment operated in New England, New York, Southeast Florida, Northern California, and Southern California, and offered planning-based financial strategies, wealth management, family office, tax planning, and trust services to individuals, families, institutions, and nonprofit institutions.

26.     Prior to 2020, Boston Private had another reportable business segment: Affiliate Partners, which comprised registered investment advisers KLS Professional Advisors Group, LLC ("KLS") and

Dalton, Greiner, Harman, Maher & Co., LLC ("DGHM"), as well as Anchor Capital Advisors, LLC ("Anchor"), and Bingham, Osborn & Scarborough, LLC ("BOS"). Boston Private completed the sale of its ownership interests in Anchor and BOS in 2018, and integrated KLS and DGHM into its other reportable business segments.

27.     Following this streamlining of its corporate structure and business lines, Boston Private was well positioned for continued, sustained economic growth. Indeed, along with the financial results that Boston Private released in October 2020, less than three months before the merger was announced, the Company reaffirmed its then-current strategies in a press release entitled *Boston Private Reports Third Quarter 2020 Results*, stating that the Company had "strengthened [its] capital and liquidity position," "remain[ed] committed to [its] strategic objectives," and "believe[d] . . . [the Company was] well positioned for long-term success."

28.     The Company's October 2020 earnings call[3] expressed a similarly optimistic long term outlook, with CEO Anthony DeChellis stating that the Company had "delivered solid results during the quarter and remain[ed] focused on moving forward key elements of [the Company's] strategic plan[.]" Although DeChellis acknowledged Covid's economic impact, he told shareholders that he was "encouraged by [the Company's] operating performance" and noted "improving trends within Wealth Management & Trust," "especially [the Company's] notable progress building [its wealth management] team in Northern California, and key upgrades to the Company's technology platform that would make the Company's "advisors more productive [and] improve [the] client onboarding experience." He also observed that the Company's "funding and liquidity profile continue[d] to strengthen as a result of deposit growth" and advised shareholders that he "remain[ed] optimistic about [Boston Private's] momentum . . . in both bank deposit and wealth management AUM outlook for the fourth quarter."

---

[3] Boston Private Q3 2020 Earnings Call Transcript (Oct. 23, 2020) (seekingalpha.com/article/4380645-boston-private-financial-holdings-inc-bpfh-ceo-anthony-dechellis-on-q3-2020-results-earnings)

29.     DeChellis had struck the same positive tone in the preceding earnings call in August 2020,[4] telling shareholders that Boston Private remained "intensely focused on [its] strategic growth plans" and that he was optimistic that "key trends in financial services" would present the Company with further business opportunities to "deliver an exceptional client experience." Specific "cause[s] for optimism" included the Company's timely progress on customer-facing tech projects that would allow the Company to bring in clients through a purely online interaction, give existing clients access to the Company's wealth management services through personal computers and mobile devices, and provide customers with increased choice over the service models they desired from the Company. Further, "client acquisition efforts [were] trending positively in key areas," "[r]ecent momentum in [the] pipeline ma[de] [the Company] optimistic about both . . . bank deposit and wealth management AUM outlook," and "[the Company had] regained momentum in hiring high-quality advisers after a temporary slowdown entering the pandemic."

30.     Steve Gaven, Boston Private's CFO, was also positive about the Company's financial performance during Covid.[5] The private banking segment's loan portfolio had "demonstrated low loss rates" throughout the pandemic and the "residential housing markets [the Company] operated in continu[ed] to perform at a high level[.]" Similarly, properties securing the Company's commercial loans to retail establishments were experiencing "improvements in . . . cash flow trends, with rent collections increasing from the high-70% range in June to approximately 80% in September." There had also been a "material decline" in loan payment deferral requests amongst both commercial and residential borrowers, which had stayed in the low single digits as a percentage of the Company's loan portfolio. Further, an apparent $12m drop in AUM in the Company's wealth management division had been primarily caused by customers transferring funds to deposit products in the Company's banking segment, not by clients pulling assets from the Company.

---

[4] Boston Private Q2 2020 Earnings Call Transcript (Jul. 29, 2020) (fool.com/earnings/call-transcripts/2020/07/29/boston-private-financial-holdings-inc-bpfh-q2-2020.aspx)
[5] *See*, Boston Private Q3 2020 Earnings Call Transcript (Oct. 23, 2020) (seekingalpha.com/article/4380645-boston-private-financial-holdings-inc-bpfh-ceo-anthony-dechellis-on-q3-2020-results-earnings)

31.     Reports by outside analysts, while expressing some caution, likewise provided cause for confidence in the Company's long term success. A Janney report released in December 2020,[6] one month prior to the merger announcement, acknowledged the Company's goal of growing the wealth management group's AUM, and noted that Boston Private's stock market capitalization of 79% of the Company's tangible book value[7] ("TBV") represented a discount in both absolute terms and relative to norms for the banking industry.

32.     Further, the report predicted that per share TBV would rise from $9.48 in Q4 2020 to $10.60 by 2022, and indicated that a reversion to the mean in banking sector price-to-TBV norms could be expected to give the Company's stock a helpful lift. Additional 2020 reports by equity research companies provided targets of $9 per share,[8] based on factors including positive AUM inflows in the Company's wealth management business, the Company's lack of exposure in its loan portfolio to movie theaters, casinos, airlines, and cruise lines, and an upturn in the Company's net interest income[9] ("NII") that had exceeded analyst expectations.

33.     In short, the horizon looked good for Boston Private's shareholders. The Company was positioning itself for success by streamlining its structure and developing key technologies that would offer industry-leading customer service, had not suffered any unusual Covid-related losses, and was trading at a TBV discount that left its stock price significant room to grow.

---

[6] "*Boston Private Financial Holdings, Inc. – Moderately Better EPS Outlook, Still Low ROA & ROTCE. New Catalysts Needed for Material Stock Price Change*," Janney (Dec. 2, 2020)

[7] "Tangible Book Value" is a measure of a company's worth without the inclusion of intangible assets such as goodwill, brand recognition, and intellectual property.

[8] *Returning to Market Perform; Dividend Discussion Likely Keeps Valuation in Check*, Keefe Bruyette & Woods (Apr. 30, 2020) (providing $9 per share price target); *Credit and Capital Dominate Sentiment, But Advisor Stability and Net Flow Improvement Encouraging*, SunTrust Robinson Humphrey (Apr. 30, 2020) (raising price target from $8 to $9 per share).

[9] "Net interest income" is the difference between the revenue a bank generates from interest earned on assets such as loans, mortgages and securities over the interest paid out on the institution's deposits. *See, e.g., What is Net Interest Income?*, Corporate Finance Institute (corporatefinanceinstitute.com/resources/knowledge/finance/net-interest-income/)

II.     **The Merger Announcement and Troubling Aspects of the Deal: Problems with Boston Private's Merger Negotiations Process, Self-Dealing by DeChellis, and the Transaction's Failure to Maximize Shareholder Value.**

34.     Given the foregoing business tailwinds, there was substantial negative shareholder reaction to the Company's January 4, 2021 announcement[10] that it had agreed to be bought for consideration worth a mere $10.94 per share,[11] lower than the Company's stock had often traded at prior to Covid.[12]

35.     HoldCo Asset Management, LP ("HoldCo"), a value investor that had acquired 4.9% of Boston Private based on the Company's long term fundamentals, immediately released an open letter stating its concern that Boston Private's leadership team had not conducted a competitive sale process, sold the Company for less than its true worth, and made self-serving arrangements for DeChellis and further senior executives:

> "Our primary concern is that . . . it does not appear BPFH conducted a competitive process to maximize value for shareholders. Despite what might appear to be a meaningful premium, BPFH has been trading at a discount to tangible book value and an even more significant discount to potential acquirers, including SVB. [W]e estimate that BPFH should have easily been able to obtain a premium of at least 60% (1.4x tangible book value) in a competitive process. In fact, while we had not identified SVB as a potential partner for BPFH, our math indicates that SVB could afford to pay a substantially higher price for the Company while still delivering attractive returns to its own shareholders. […] The purchase price would be even higher if the massive restructuring charge, which includes "growth investments" and talent retention packages, were more in line with other transactions.
>
> As it currently stands, this transaction values BPFH at the second lowest tangible book value multiple of any company acquired in 2020 with a deal value over $100 million. This is for a franchise with substantial scale, an established brand, excellent core deposit franchise and irreplicable wealth management business that operates in some of the best markets in the county. Even more worrisome, we are being asked to exchange our shares for shares of SVB, a bank that currently trades at 2.76x tangible book value and nearly 20x earnings following a 55% run-up in its stock price over the last year, a year in which the SNL U.S. Bank Index fell 16%. Needless to say, we are not enthusiastic about exchanging massively undervalued currency for currency trading at such a high multiple.

---

[10] *See*, Boston Private Form 8-K with press release announcing merger (Jan. 4, 2021) (sec.gov/ix?doc=/Archives/edgar/data/0000821127/000114036121000069/nc10018581x1_8k.htm)

[11] As of December 31, 2020, the last trading day before the announcement of the merger.

[12] Boston Private stock had traded for $10-12 per share in the months prior to the market drop caused by Covid, in the range of $10-17.50 per share in 2018, and at $14-16.50 in 2017.

> When we consider this alongside the miniscule 20% cost savings, enormous $200 million restructuring charge (which includes "growth investments" and talent retention packages) and the ongoing role for key BPFH executives (including Mr. DeChellis as co-head of the combined private banking and wealth management business), we worry that the Board may have cut a deal that was optimal for management but suboptimal for shareholders."[13]

36.     Adding fuel to the misgivings of perturbed shareholders, First Foundation Wealth Management ("FFWM") CEO Scott Kavanaugh emailed HoldCo's main partner Vik Ghei to blow the whistle on DeChellis's apparently intentional and not fully disclosed avoidance of a competitive sales process.[14] According to Kavanaugh, DeChellis had rebuffed FFWM's persistent attempts to initiate merger discussions, and in particular had done so on the false pretext that Boston Private's Board was not interested in pursuing a sale:

> From: Scott Kavanaugh
> To: Vik Ghei
> Subject: BPFH
> Date: Tuesday, January 5, 2021 11:41:48 AM
>
> Dear Vic:
>
> I read your letter this morning regarding the announced sale of Boston Private. I noticed you listed FFWM as a potential acquirer. I am reaching out because I had been persistently calling Mr. DeChellis to pursue a dialogue about a merger. His last conversation with me towards the end of November was that the board had instructed him to focus on getting the stock price higher and that they were not interested in pursuing a sale.
>
> We were never contacted from the company or its investment bankers at any time.
>
> If you would like to discuss further, please contact me at (XXX) XXX-XXXX.
>
> Thank you,
>
> Scott Kavanaugh
> CEO – First Foundation

---

[13] *See*, HoldCo open letter to Boston Private leadership and investor presentation, Jan. 5, 2021 (bpvalue.com/wp-content/uploads/2021/03/HoldCo-Letter-to-Boston-Private-Leadership-and-Investor-Presentation.pdf)
[14] *See*, HoldCo open letter to Boston Private leadership with annexed email from Scott Kavanaugh, Jan 5. 2021 (holdcoam.com/wp-content/uploads/Second_Letter_to_BPFH.pdf)

37.     HoldCo, which viewed Kavanaugh's email as supporting shareholder suspicions about Boston Private's failure to explore prime alternative deals,[15] was so alarmed by the proposed merger's failure to deliver value and Boston Private's lack of transparency that it commenced a proxy fight after the release of Boston Private's definitive proxy on March 18, 2021.[16]

38.     Further concerns surfaced as dissenting shareholders probed the deal further. Boston Private's merger discussions with SVB had emerged not from a broad investigation of the Company's deal options, but from talks between DeChellis and SVB's CEO that on Boston Private's end were motivated by tentative interest in a joint venture.[17] These talks started in March 2020, while Boston Private's stock price was dropping as part of the larger Covid-induced stock market downturn, had been initiated by an unnamed investment banker, and from March to the end of May were confined to personal and private discussions between DeChellis and the CEO of SVB only.

39.     Moreover, upon information and belief based on Boston Private's proxy materials, DeChellis did not begin informing the Company or Board of his communications with SVB's CEO until April-May 2020. DeChellis kept other figures at Boston Private out of his talks with SVB's CEO until May 26, 2020, and Boston Private's management and board were not made aware of SVB's particular interest in a merger until July 2020. Further, Boston Private's management and Board learned of SVB's interest in an acquisition not from DeChellis, but from representatives of SVB, when representatives of SVB began formally requesting information that would allow SVB to conduct due diligence for a potential transaction. It was only at this late point, in July 2020, that Boston Private representatives sought a "customary standstill provision" that would prevent SVB from negotiating with DeChellis without the involvement of Boston Private's Board. Disturbingly, the first board meeting that notified the Company's directors of SVB's

---

[15] *See*, HoldCo open letter to Boston Private leadership with annexed email from Scott Kavanaugh, Jan 5. 2021 (holdcoam.com/wp-content/uploads/Second_Letter_to_BPFH.pdf)
[16] Boston Private definitive proxy statement (Mar. 18, 2021)
(sec.gov/Archives/edgar/data/0000821127/000119312521084509/d97737ddefm14a.htm)
[17] *How joint venture negotiations led to a $900 million bank merger*, Paul Davis (American Banker) (Feb. 16, 2021)
(americanbanker.com/news/how-joint-venture-negotiations-led-to-a-900-million-bank-merger)

interest in a merger was held on July 21, 2020, months after the start of DeChellis's private exchanges with SVB's CEO.

40.     During Boston Private's negotiations with SVB, DeChellis also engaged in a pattern of behavior of discouraging incoming interest from alternative merger partners. In addition to rejecting interest from Kavanaugh at FFWM in November 2020 and earlier, DeChellis closed the door on inquiries in September 2020 from the CEO of a "large bank holding company"[18] ("Company A") and the CEO of the subsidiary of a wealth management and investment firm.[19] Kavanaugh and Company A's CEO were shut down with the false story that Boston Private was not interested in pursuing a sale, and DeChellis told the third CEO – who had simultaneously reached out to Boston Private's board – that Boston Private was not interested in a transaction at the CEO's stated price level. *See*, email from Scott Kavanaugh to Vik Ghei, *supra* ("[DeChellis's] last conversation with me towards the end of November [2020] was that the board had instructed him to focus on getting the stock price higher and that they were not interested in pursuing a sale"); Definitive Proxy p. 48 (stating that DeChellis told the CEO of Company A that "the board was not specifically pursuing a sale of [Boston Private] at th[e] time"); *id.* (stating that DeChellis told the CEO of the wealth management subsidiary that Boston Private "was not interested in pursuing a transaction" at the price level adverted to by that company).

41.     None of these responses by DeChellis attempted to elicit higher offers, and DeChellis also never affirmatively reached out to alternative partners himself or publicly signaled that Boston Private was interested in a deal. Since everything DeChellis said on the Company's earnings calls and in communications with alternative deal partners indicated that Boston Private was committed to remaining independent, no potential buyers apart from SVB knew that Boston Private was selling. Notably, DeChellis engaged in this pattern of undermining Boston Private's exploration of deal alternatives long before the Company's execution of an exclusivity agreement with SVB, which was signed on December 5, 2020, one month prior

---

[18] Definitive Proxy p. 48
[19] Unnamed in Boston Private's proxy materials. *Id.*

to the public announcement of the merger.

42.     DeChellis's willful avoidance of placing competitive pressure on SVB – coupled with Boston Private's misguided focus on the deal's nominal value – allowed SVB to drop the share exchange ratio during negotiations from .0365 in September 2020 to .0228 at announcement in January 2021, a 37.5% drop in the share consideration portion of the deal.

43.     Financial reports likewise lent credence to the view that Boston Private's board and leadership had agreed to a merger that failed to adequately compensate shareholders for their stake in the Company. *See*, *e.g.*, *Holdco has a point about Boston Private*, Jeff Davis (S&P Global Market Intelligence) (Jan. 28, 2021);[20] *Boston Private had another suitor before inking SVB Financial deal*, Leo Gatdula (S&P Global Market Intelligence) (Feb. 16, 2021).[21] Proxy advisor Institutional Shareholder Services, in particular, published a notably cautionary report on the deal, indicating that shareholders were right to be troubled by DeChellis's influence over negotiations given his post-merger employment and compensation arrangements with SVB, and were right to suspect that Boston Private's negotiators had sold out for a price that was too low:

> "Our analysis points to several conclusions: 1) Is the deal opportunistic? Probably, as evidenced by the valuation gap between the two companies when the deal was struck. 2) Can the buyer afford to pay more, as [HoldCo] suggests? Most likely,  given the size of the transaction relative to SIVB's market cap, the benefits of the deal for the acquirer, and possible levers, such the current lack of any TBV earnback period. 3) Is the immediate downside risk of rejecting the deal material? Probably not, as evidenced by the recent appreciation of the index and relevant peers. Given these factors, certain shareholders may opt to reject the transaction as a limited-risk option to elicit an improved offer. […]
>
> SIVB's current high valuation, attractive metrics from both an EPS accretion and TBV dilution standpoint, positive market reaction, the strong strategic nature of the deal, and uncertainty surrounding SIVB's timeline to build a competing  product offering suggest that it would be easier for SIVB to consider increasing the offer rather than walking away in the event that BPFH shareholders reject the proposed terms. […]

---

[20] Available at spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/holdco-has-a-point-about-boston-private-62319302
[21] Available at spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/boston-private-had-another-suitor-before-inking-svb-financial-deal-62632755

Management's assertion that banks typically do not engage in competitive sales processes seems primarily applicable to mergers of equals. In that sense, a market check or limited auction could have provided more comfort to shareholders, particularly given the fact that the sales process, as described in the proxy, leaves the impression that the company was not as responsive to outreach from potential bidders as shareholders may have preferred.

[HoldCo] points to DeChellis' employment agreement with SIVB and the significant retention bonuses to other BPFH executives as evidence that BPFH favored SIVB as a potential acquiror. While the board has stated that negotiations with SIVB were led by Chairman Waters and independent director Furlong, the presence of DeChellis throughout the negotiations raises doubts that could have been avoided had the board created a committee of disinterested directors to lead negotiations."[22]

44.    As payment for steering the merger SVB's way, SVB rewarded DeChellis shortly before the merger closed with a term sheet that granted him a significant pay increase. Overall, his annual compensation would increase from $2.19 million to over $5 million, with the value of his equity award in particular increasing by more than 300%, from $1.1 million to $3.5 million, paid as a $1.5 million annual "equity incentive opportunity," a $4 million block of service-vesting restricted stock units vesting in $1 million installments over a four year period, and $3 million in performance-vesting restricted stock units vesting on the third anniversary of the grant date.[23]

45.    Topping things off from a financial perspective for DeChellis, the merger entitled him to $3.5 million in severance pay from Boston Private, which had given him a further reason to channel negotiations towards a purchaser he knew would be able to conclude a deal quickly – especially if the purchaser felt it was getting a good price. Further, as DeChellis's earlier ambition of massively expanding Boston Private's wealth management business suggested, wealth management was where he wanted to be professionally, and SVB fulfilled that career goal for DeChellis by making him co-head of its wealth management division.

---

[22] Quoted extracts of ISS report available at bpvalue.com/wp-content/uploads/2021/04/Holdco-Comments-on-ISS-Report.pdf (HoldCo letter reproducing pertinent parts of ISS report) (Apr. 15, 2021).
[23] Definitive Proxy p. 104.

46.     Moreover, even prior to the purported first provision of SVB's employment terms, DeChellis knew that he could expect a high-compensation, high-profile role in SVB's wealth management segment. He expected to make substantially more as a senior executive at SVB because he was aware of SVB's reputation in the finance world as the highest paying bank in the U.S.[24]  And he expected that SVB would offer him a high-profile position in its wealth management segment because he understood that SVB wanted to acquire Boston Private as a means of developing SVB's wealth management business, and was aware that SVB would see his own career background in the wealth management field as complementary to that business goal.

47.     The two further people on Boston Private's merger working group were directors with extensive further professional commitments who lacked the "skin in the game" necessary to keep DeChellis' in check, much less prevent him from selling Boston Private at a discount in exchange for substantial personal gain. Waters and Furlong each had infinitesimal interests of the Company,[25] and neither had a large enough personal stake in the Company relative to their net worths to motivate them to ensure that DeChellis made every effort to maximize shareholder value.

### III.     Boston Private's False and Misleading Responses to Pressure from HoldCo and Further Investors.

48.     In response to shareholders who sought to draw attention to the deal's problematic aspects, Boston Private released a series of materially false and misleading proxy solicitations that aimed to persuade stockholders to accept the merger. As set forth below, the following statements by Defendants were false

---

[24] SVB was ranked the #1 paying US Bank in 2018. *See*, *Silicon Valley Bank Pays $250,000 Per Employee, Tops in the U.S.*, Shelly Hagan (Bloomberg) (May 10, 2019) (bloomberg.com/news/articles/2019-05-10/silicon-valley-bank-pays-250-000-per-employee-tops-in-the-u-s#:~:text=Silicon%20Valley%2C%20better%20known%20for%20hot%20tech%20start-ups,in%202018%2C%20according%20to%20data%20compiled%20by%20Bloomberg)
[25] According to insider trading disclosures, Waters and Furlong respectively owned 50,885 and 44,901 shares in Boston Private as of May 14, 2021. *See*, SEC Form 4s filed by Waters and Furlong (May 14, 2021) (Form 4 for Waters: sec.gov/edgar/search/#/ciks=0000821127&entityName=BOSTON%2520PRIVATE%2520FINANCIAL%2520HOLDI NGS%2520INC%2520(BPFH)%2520(CIK%25200000821127) (Form 4 for Furlong: sec.gov/edgar/search/#/ciks=0000821127&entityName=BOSTON%2520PRIVATE%2520FINANCIAL%2520HOLDI NGS%2520INC%2520(BPFH)%2520(CIK%25200000821127)

and misleading because they lied to shareholders about incoming interest from FFWM CEO Scott Kavanaugh and other individuals (Statements I-III), misled shareholders about a highly cautionary evaluation of the deal by proxy advisor Institutional Shareholder Services (Statements IV-V), deceived shareholders about the merger consideration's lack of value (Statements VI-VII), and lied about whether the Board subjectively believed that the merger was the best option available for the Company (Statement VIII).

> **Materially False and Misleading Statement (I):** That DeChellis and Boston Private had closed the door on incoming interest from Scott Kavanaugh, CEO of "similarly-sized California-based bank holding company" FFWM, because "*Boston Private had previously determined that such a transaction would not be financially attractive or create meaningful value for Boston Private shareholders, and that this company was not a strong financial, cultural, or strategic fit for Boston Private [and that] [a]ccordingly there was no reason to engage in further discussions*[.]" Boston Private Shareholder Letter & Proxy Solicitation, p. 4 (Apr. 7, 2021)

49.     This statement was false and misleading because it lied to shareholders about DeChellis's reasons for cutting off potential talks with FFWM CEO Scott Kavanaugh in November 2020.

50.     DeChellis shut down Kavanaugh's persistent attempts to start a dialogue about a merger not because he viewed a transaction with FFWM as lacking shareholder value, but because he already anticipated that SVB would pay him back for underpricing Boston Private with a high-profile, high-compensation position in SVB's wealth management business. He understood that SVB was interested in acquiring Boston Private because it wanted to develop SVB's wealth management business and anticipated that SVB would see his career background in wealth management as complementary to that goal. He also expected to make significantly more as a senior executive at SVB because he was aware of SVB's reputation in the banking industry for extremely high compensation.[26]

51.     Further, the statement was materially misleading because it concealed a potential breach of fiduciary duty by DeChellis during the negotiations process and at a minimum failed to disclose information

---

[26] SVB was ranked the #1 paying US Bank in 2018. *See, Silicon Valley Bank Pays $250,000 Per Employee, Tops in the U.S.*, Shelly Hagan (Bloomberg) (May 10, 2019) (bloomberg.com/news/articles/2019-05-10/silicon-valley-bank-pays-250-000-per-employee-tops-in-the-u-s#:~:text=Silicon%20Valley%2C%20better%20known%20for%20hot%20tech%20start-ups,in%202018%2C%20according%20to%20data%20compiled%20by%20Bloomberg)

that shareholders needed to know to make an informed decision about whether they should reject the merger. Shareholders expected DeChellis to engage potential serious merger partners, and his willful avoidance of discussions with FFWM should have therefore been disclosed to shareholders as a material fact relevant to evaluating the deal. Defendants' failure to candidly inform shareholders about DeChellis's rejection of Kavanaugh's entreaties in this statement was therefore materially misleading.

> **Materially False and Misleading Statement (II):** That First Foundation's "apparent interest was in being acquired by Boston Private," rather than interest in a dialogue about a merger. Boston Private Shareholder Letter & Proxy Solicitation, p. 4 (Apr. 7, 2021)

52.    This statement misled shareholders about the existence and nature of Scott Kavanaugh's calls to DeChellis in 2020. As Kavanugh disclosed to HoldCo, Kavanaugh had been attempting to begin a dialogue with DeChellis about a merger, not an acquisition of FFWM by Boston Private where Boston Private would be paying a market premium. *See*, Kavanaugh email to HoldCo, *supra* ("I had been persistently calling Mr. DeChellis to pursue a dialogue about a merger. His last conversation with me towards the end of November [2020] was that the board had instructed him to focus on getting the stock price higher and that they were not interested in pursuing a sale."). As Kavanaugh's e-mail indicates, FFWM's interest was not limited to "being acquired by Boston Private." The foregoing statement about FFWM's "apparent interest" was therefore materially false or misleading.

> **Materially False and Misleading Statement (III):** That "no . . . institution, other than SVB Financial, ever submitted a proposal regarding a potential acquisition or strategic business combination to Boston Private." Boston Private Definitive Proxy, p. 61 (Mar. 18, 2021)

53.    This statement was materially misleading because it omitted information about FFWM's interest in a merger, misinformed shareholders about potential industry interest levels in a deal, and failed to disclose that DeChellis had been undermining Boston Private's ability to explore deal alternatives.

54.    Unbeknownst to shareholders, the CEO of a prime merger partner had been persistently calling DeChellis to pursue dialogue about a merger – and was falsely told by DeChellis

that Boston Private was not interested in pursuing a sale. Similarly concealed was DeChellis's pattern of willfully undermining Boston Private's ability to pursue alternative offers from other CEOs. As set forth above, DeChellis had rejected interest from FFWM and Company A on the pretext that Boston Private was not interested in pursuing a sale, and told a third CEO that Boston Private was not interested in a deal at the price point stated by that CEO. None of DeChellis's responses to these CEOs sought to elicit higher offers or place competitive pressure on SVB, and DeChellis also publicly signaled that the Company was not interested in a merger on the Company's earnings calls.

55.    The statement was also misleading because it suggested to shareholders that the inquiries by Kavanaugh and the further CEOs had been unserious and not worth pursuing. In truth, these CEOs were making serious efforts to initiate merger discussions, and shareholders deserved to not have that fact obscured by the Company.

> **Materially False and Misleading Statement (IV):** That the independent proxy advisory company Institutional Shareholder Services had "recommend[ed] that Boston Private shareholders support the recommendation of [Boston Private's] Board and vote in favor of the merger with SVB Financial." Boston Private Press Release & Proxy Solicitation (Apr. 14, 2021)

> *- and -*

> **Materially False and Misleading Statement (V):** That ISS's report "underscore[d] that the transaction with SVB Financial [was] financially and strategically compelling and provide[d] the best path for maximizing value for Boston Private shareholders." (*Id.*)

56.    These statements were false and misleading because they misrepresented ISS's significantly cautionary report as an outright endorsement of the merger. Describing the report as a "recommendation" concealed the document's significant cautionary and negative language, and stating that the report "underscore[d]" that the transaction "[was] financially and strategically compelling" was false and misleading.

57.    In truth, the ISS report described the deal as probably opportunistic, discussed considerations indicating that BPFH was being underpriced, and concluded that SVB could probably

pay more. Thus, to the extent the report was a recommendation, it was at a minimum highly cautionary and was certainly not an outright endorsement underscoring the transaction's "worth."

58.   Moreover, the report advised shareholders that the downside risk of rejecting the deal was probably not material, since SVB would most likely respond by increasing its offer, not walking away from the merger. Given these factors, ISS stated, shareholders could reasonably *opt to reject the transaction as a limited-risk option to elicit an improved offer."*

59.   Further, since the report was not publicly available, shareholders were not able to easily evaluate the truth of Boston Private's press release for themselves. Despite HoldCo's release of portions of the report, the full report was never reproduced, meaning that investors were never able to fully evaluate Boston Private's misleading statements about the report for themselves.

**Materially False and Misleading Statement (VI):** That "[t]he Board negotiated to increase the value of the value of the merger consideration from approximately $7.60 per Boston Private share to $10.94 per Boston Private share at the date of announcement of the transaction[.]" Boston Private Shareholder Letter & Proxy Solicitation, p. 4 (Apr. 7, 2021)

60.   Focusing on the deal's nominal value without discussion of the merger's exchange ratio failed to put the deal into context for shareholders and also obscured how the exchange ratio had dropped during negotiations from .0365 in September 2020 to .0228 in January 2021. This obscured that Boston Private's shareholders were getting less than they would have received under SVB's original terms, and further concealed a valid reason to believe that rejecting the deal could be used to elicit a better offer from SVB. Since SVB had previously been willing to pay more in share consideration, reasonable grounds existed to believe that SVB could once again be made to pay more. Boston Private hid that information by giving a superficial and misleading gloss of the ISS report, and hid that information once again here by misleadingly and self-servingly emphasizing nominal value over share exchange ratio.

**Materially False and Misleading Statement (VII):** That the merger provided shareholders a "compelling premium" that had "substantially increased since [December 31, 2020] as a result of the appreciation of SVB Financial's share price, [...] corresponding to a 56% premium to Boston Private's unaffected share price as of

immediately prior to announcement[.]" (*Id.*)

61.     It was misleading to claim Boston Private obtained a "premium" when share prices were temporarily depressed due to the pandemic. The deal offered no premium relative to the Company's share price in the months prior to the stock market drop caused by Covid, and a significant loss relative to share prices in 2017-2018. The Merger Consideration only represented a "premium" compared to a temporarily depressed share price, not the Company's inherent value and future prospects. The statement also obscured that the purported premium was low compared to the Company's TBV, a part of the analysis that the Company misleadingly and self-servingly downplayed in its solicitations.

> **Materially False and Misleading Statement (VIII):** That "[t]he Board believe[d] that the transaction with SVB Financial provide[d] substantially higher and more certain value to Boston Private shareholders than the company's available alternatives." (*Id.*)

62.     This statement was false because the Board was aware that the proposed transaction failed to maximize value for Boston Private shareholders and was financially unfair.

63.     In truth, the Board knew that the merger was negotiated while Boston Private's worth and prospects were not reflected in the Company's share price, suspected that DeChellis had not adequately investigated potential deals, and understood that the merger would result in shareholders being underpaid for their ownership interests in the Company, while DeChellis and further Company insiders would receive millions of dollars in cash compensation, severance payments, and stock units.

### IV.     Economic Damages and Losses Caused to Boston Private Shareholders by Defendants' Misrepresentations and the Unfair Merger.

64.     Defendants' false and misleading representations caused Boston Private's shareholders hundreds of millions of dollars in economic losses by inducing stockholders to accept a merger that underpriced the Company and failed to compensate stockholders for the value of their shares.

65.     As of December 31, 2020, the last trading day before the announcement of the merger, the merger consideration was worth a mere $10.94 per Boston Private share. In January 2020, however, prior to the stock market drop caused by the pandemic, the Company had traded in the range of $12 per share,

and had traded at even higher levels in earlier recent years. Prices ranged from $10-17.50 per share in 2018, and ranged from at $14-16.50 in 2017.

66.     Moreover, the merger and Defendants' conduct caused the Company's shareholders to lose out on alternative options that offered shareholders far greater value, including independently growing the Company, obtaining alternative higher offers from other bidders, and pressuring SVB to provide a better share exchange ratio. Not only did Defendants allow the share exchange ratio to drop during negotiations, but DeChellis's pattern of undermining Boston Private's ability to explore alternative deals caused shareholders to miss out on competitive pressure that would have brought the exchange ratio even higher. DeChellis likewise failed to solicit interest from other banks, shut down incoming interest from at least three prime potential partners, and signaled to the market that Boston Private was not for sale on the Company's earnings calls and public communications. As a result, the merger led to Boston Private being priced at announcement at the second-lowest tangible book value multiple of any company acquired in 2020 with a deal value over $100 million.

67.     For the foregoing reasons, the Boston Private's merger negotiations with SVB resulted in a deal that undervalued the Company, and the Board's concealment of material information concerning this fact led shareholders to accept consideration that caused them substantial economic damage.

## CLASS ACTION ALLEGATIONS

68.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of Boston Private (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

69.     This action is properly maintainable as a class action because:

(a)     the Class is so numerous that joinder of all members is impracticable. As of March 15, 2021, the record date to vote on the merger, there were 82,438,353 shares of Boston Private common stock outstanding, held by hundreds to

thousands of individuals and entities scattered throughout the country. The actual number of public stockholders of Boston Private will be ascertained through discovery;

(b)    there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i.    whether Defendants misrepresented or omitted material information in the Definitive Proxy and further identified proxy solicitations in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9;

ii.    whether the Individual Defendants violated Section 20(a) of the Exchange Act; and

iii.    whether Plaintiff and other members of the Class suffered damages as a result of being compelled to vote for the Merger based on the materially false, incomplete, and/or misleading Proxy.

(c)    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)    the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

(f)    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)    a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

70.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

71.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

72.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

73.     Defendants issued the March 18, 2021 Definitive Proxy, the April 7, 2021 Shareholder Letter & Proxy Solicitation, and the April 14, 2021 Press Release & Proxy Solicitation and/or permitted the use of their names in the foregoing releases with the intention of soliciting stockholder support for the unfair Merger Agreement.

74.     Each Defendant reviewed and authorized the dissemination of the foregoing releases, which misrepresented and omitted the above-referenced material information, which in turn rendered the statements identified herein materially false, misleading, and incomplete because such statements concealed incoming interest in alternative deals by prime merger partners, misrepresented a highly cautionary report on the merger by an independent proxy advisor, misdirected shareholders about aspects of

the merger that failed to maximize shareholder value, and lied about the Board's belief in the proposed transaction's worth.

75.     Thus, the proxy releases contained untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.

76.     Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Boston Private, were aware of the false, misleading, and omitted information but failed to ensure such information was materially complete and accurately disclosed in Boston Private's proxy solicitations, in violation of Section 14(a) and Rule 14a-9.

77.     The Individual Defendants knew or were negligent in not knowing that the proxies were materially false, misleading, and incomplete regarding the above-referenced material information.

78.     The Individual Defendants knew or were negligent in not knowing that the material information identified above had been misrepresented and/or omitted in the proxies, rendering the sections of the proxies identified above materially false, misleading, and incomplete.

79.     The Individual Defendants reviewed and relied upon the material information identified above in connection with their decision to approve and recommend the Merger.

80.     Further, the Individual Defendants were privy to and had knowledge of the facts concerning the process involved in selling Boston Private as well as the Company's true value, which was far greater than the inadequate consideration the Company's stockholders are to receive from SVB.

81.     Indeed, the Individual Defendants had a fiduciary obligation to review the foregoing releases and statements and corroborate that there were no material misstatements or omissions.

82.     The preparation of a proxy solicitation by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.

83.    The Individual Defendants were negligent in choosing to misrepresent and omit material information in the proxies or failing to notice the material misrepresentations and omissions in the proxies upon reviewing them, which the Individual Defendants were required to do carefully.

84.    Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the foregoing proxy materials.

85.    Boston Private is also negligent as a result of the Individual Defendants' negligence in preparing and reviewing the proxies.

86.    The above-referenced information that was misstated, mispresented and omitted in the proxies was material to Plaintiff and the Class, who were deprived of their right to cast an informed vote because such falsities, misrepresentations, and omissions were not corrected prior to the vote on the Merger and thus rendered the above-refenced sections of the foregoing proxy solicitations materially false, misleading, and incomplete.

87.    As a direct and proximate result of the dissemination of the materially false, misleading, and incomplete proxies that Defendants used to obtain stockholder approval of the Merger, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.*, the difference between the value they received as a result of the Merger and the true value of their shares at the time of the Merger) in an amount to be determined at trial.

## **COUNT II**

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

88.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

89.    The Individual Defendants acted as controlling persons of Boston Private within the meaning of Section 20(a) of the Exchange Act as alleged herein.

90.    Because of the Individual Defendants' positions as officers and/or directors of Boston

Private, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false, misleading, and incomplete statements contained in the proxy solicitations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that were materially false, misleading, and incomplete.

91.     Each Individual Defendant was provided with or had unlimited access to copies of the proxies and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

92.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.

93.     The proxies at issue contain the unanimous recommendation of each of the Individual Defendants to approve the Merger. They were thus directly involved in and responsible for preparing the proxy materials.

94.     In addition, as the proxies sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The proxies describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

95.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

96.     As set forth above, the Individual Defendants had the ability to exercise control over

and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.

97.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

98.     As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.,* the difference between the value they received as a result of the Merger and the true value of their shares at the time of the Merger) in an amount to be determined at trial.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment and relief as follows:

A.   declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.   awarding Plaintiff and the Class compensatory and/or rescissory damages sustained as a result of Defendants' wrongdoing, including, but not limited to, pre-judgment and post-judgment interest;

C.   granting Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' fees, expert fees, and expenses;

D.   awarding extraordinary and/or equitable relief as permitted by law, equity, and the federal statutory provisions sued upon hereunder; and

E.   granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated: September 20, 2021


**MONTEVERDE & ASSOCIATES PC**

Juan E. Monteverde
Miles D. Schreiner
Jonathan T. Lerner
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
jmonteverde@monteverdelaw.com
mschreiner@monteverdelaw.com
jlerner@monteverdelaw.com

*Of Counsel*


**BRODSKY SMITH**

Evan J. Smith
Marc L. Ackerman
Ryan Cardona
Two Bala Plaza, Suite 805
Bala Cynwyd, PA 19004
Tel: (610) 667-6200
Fax: 610.667.9029
esmith@brodskysmith.com
mackerman@brodskysmith.com
rcardona@brodskysmith.com

*Of Counsel*

/s/ *Mitchell J. Matorin*
Mitchell J. Matorin
**MATORIN LAW OFFICE, LLC**
Mitchell J. Matorin (BBO# 649304)
18 Grove Street, Suite 5
Wellesley, MA 02482
(781) 453-0100
mmatorin@matorinlaw.com

*Attorneys for Plaintiff*