## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————————————
                                                )
RICHARD SAVOY, Individually and on              )
Behalf of All Others Similarly Situated,)
                                                )
                              Plaintiff,        )
                                                )
v.                                              )        Civil Action
                                                )        No. 21-11537-PBS
BOSTON PRIVATE FINANCIAL HOLDINGS, INC.,)
et al.,                                         )
                                                )
                              Defendants.       )
———————————————————————————)

### MEMORANDUM AND ORDER

August 26, 2022

Saris, D.J.

### INTRODUCTION

Plaintiff brings a putative class action on behalf of himself and all similarly situated former public shareholders of Boston Private Financial Holdings, Inc. ("Boston Private" or the "Company") against Boston Private, its former Chief Executive Officer Anthony DeChellis, and former members of Boston Private's Board of Directors for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(a) and 78t(a), and United States Securities and Exchange Commission Rule 14a-9, 17 C.F.R. § 240.12a-9. Count I alleges that Boston Private's proxy solicitations regarding approval of its merger with SVB Financial Group, Inc., ("SVB") contain false or misleading

statements, omissions, and half-truths. Count II alleges that the individual defendants are liable pursuant to Section 20(a) of the Exchange Act.

Defendants moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4. After a hearing, the Court **ALLOWS** Defendants' Motion to Dismiss (Dkt. 24).

## FACTUAL BACKGROUND

The following facts are taken from the Complaint, the proxy solicitations, and other communications referenced in the Complaint.

## I.   The Merger Agreement

Boston Private was a publicly traded Massachusetts corporation offering banking and wealth management services. In October 2020, the Company stated in a press release that it believed it was "well positioned for long-term success." Dkt. 23 ¶ 27. Its CEO, DeChellis, also stated in an earnings call that he "remain[ed] optimistic about [Boston Private's] momentum." Id. ¶ 28.

On January 4, 2021, after a negotiation between SVB and the Board of Directors, Boston Private and SVB announced they had entered into an agreement and plan of merger pursuant to which

Boston Private would merge into SVB, with SVB continuing as the surviving corporate entity. <u>See</u> Dkt. 26-2. The proposed merger would award each Boston Private shareholder with $2.10 in cash and .0228 shares of SVB common stock as consideration for each Boston Private share, together worth $10.94 as of December 31, 2020.

## II.  **The Proxy Battle**

The next day, HoldCo Asset Management, LP, ("HoldCo")[1] the Company's fourth largest shareholder, issued two public letters and press releases outlining its concerns with the proposed merger. <u>See</u> Dkt. 23 ¶ 33; Dkt. 26-3. This set off a pitched proxy battle.

Boston Private filed its proxy statement with the SEC on March 18, 2021, <u>see</u> Dkt. 26-1, and mailed it to shareholders on March 19, 2021, <u>id</u> at 4. HoldCo filed its proxy statement on March 23, 2021, <u>see</u> Dkt. 26-4, which it supplemented with additional soliciting material under Rule 14a-12 on March 25, 2021, <u>see</u> Dkt. 26-5. Boston Private filed a press release opposing HoldCo's solicitations on April 7, 2021. <u>See</u> Dkt. 26-6. Boston Private filed an additional press release on April 14, 2021, touting the recommendation of independent proxy advisory firm Institutional Shareholder Services. <u>See</u> Dkt. 26-7. In response, HoldCo filed additional soliciting materials the next day quoting cautionary

---

[1] HoldCo, which owns approximately 4.9% of the Company's shares, is not a party to this action.

passages of the advisory recommendation. See Dkt. 26-8. In response to eight civil lawsuits by shareholders, including one by Plaintiff filed in New York in February 2021, see Dkt. 26-10, alleging Boston Private's proxy filings omitted various facts, Boston Private filed a written communication pursuant to Rule 425 on April 16, 2021, with supplemental disclosures, see Dkt. 26-11. Savoy and the other plaintiffs voluntarily dismissed their lawsuits in response without asking the Court to require Boston Private to make additional disclosures before the shareholder vote.

In essence, HoldCo contended that Boston Private did not "conduct[] a competitive process to maximize value for shareholders" and worried "the Board may have cut a deal that was optimal for management but suboptimal for shareholders." Dkt. 23 ¶ 33. HoldCo contended that DeChellis had a conflict of interest. As disclosed in the proxy, DeChellis had been offered a position as co-head of SVB's wealth management division, with a significant pay increase.

On May 4, 2021, the merger was approved by approximately 89 percent of voting shares present. See Dkt. 26-9. The merger closed on July 1, 2021.

### III. __Three Other Companies__

Three companies other than SVB expressed interest in a potential transaction with Boston Private. Immediately after the

announcement of the merger, First Foundation Wealth Management ("FFWM") CEO Scott Kavanaugh emailed HoldCo to inform it that he "had been persistently calling Mr. DeChellis to pursue a dialogue about a merger," but was told "that the board had instructed him to focus on getting the stock price higher and that they were not interested in pursuing a sale." Dkt. 23 ¶ 34. HoldCo included this email in full in the public letter it sent to Boston Private and made available to shareholders. See id. ¶ 34-35; Dkt. 26-3.

In its proxy, Boston Private disclosed that "[i]n August 2019, Mr. DeChellis had preliminary discussions with the Chief Executive Officer of a California-based bank holding company of similar size to Boston Private," but the Board "determined that the California-based company was not a strong cultural or strategic fit for Boston Private and that an acquisition of this company would not be financially attractive or create meaningful value for Boston Private shareholders." Dkt. 26-1 at 59. The company (FFWM) continued to reach out, but Boston Private "did not pursue further discussions" because of the company's size and financial profile and "its expressed interest in being acquired by Boston Private at a market premium." Id.

The proxy further disclosed that the CEO of a second company, "Company A," a large bank holding company with a significant wealth management business, requested a meeting with DeChellis and

discussed "a potential strategic transaction." Id. at 61.
DeChellis "indicated that the Boston Private board regularly
reviews its strategic alternatives and considers any strategic
options that might enhance value for Boston Private's
shareholders, and would evaluate any proposal it received, but
that the board was not specifically pursuing a sale of the company
at that time." Id. The CEO reached out to Boston Private in
November 2020 through Morgan Stanley about a "strategic
transaction," and DeChellis "noted that he would update the board
in the event any proposal or further inquiry were received from
Company A." Id. at 63. The CEO of Company A called DeChellis in
December 2020 but told him "that Company A's board of directors
had not authorized any proposal" although it "might consider a
valuation for Boston Private at a tangible book value multiple
corresponding to a general price range of around $10.50 per share."
Id. at 64. Following this conversation, "no proposal or indication
of interest was ever provided by or on behalf of Company A." Id.

Third, the proxy disclosed that the CEO "of a subsidiary of
a wealth management and investment banking firm contacted Mr.
DeChellis to inquire, on behalf of its parent company, whether
Boston Private might be interested in discussing a potential sale
at a valuation of up to a 20-25% premium to Boston Private's then-
current stock price, which at that time was in the range of $5.50
per share." Id. at 61. The CEO also reached out to the chairman of

the board of Boston Private. DeChellis "informed the Chief Executive Officer that Boston Private was not interested in pursuing a transaction at that price level." Id. No further inquiries were received from this company, nor any proposal.

HoldCo publicly criticized Boston Private in its proxy and additional soliciting materials for failing to run a comprehensive, competitive sale process, including "by negotiating exclusively with only one party—SVB—despite reported inbound interest from at least three other buyers." Dkt. 26-5 at 5. HoldCo noted that Company A "offered a higher price than what SVB was offering at the time, yet [Boston Private] entered into an exclusivity agreement with SVB on the very next day anyway." Id.

In response to HoldCo's accusations, Boston Private issued an April 7 press release supplementing its proxy. The press release argued, "A review of the inquiries from HoldCo's three purported potential buyers confirms that there was no credible reason for Boston Private to affirmatively pursue further discussions with any of these parties." Dkt. 26-6 at 6. It reiterated that the preliminary discussions with FFWM in 2019 "centered around an acquisition by Boston Private of this counterparty . . . in which Boston Private would be paying a premium," and so "there was no reason to engage in further discussions with this potential counterparty." Id. As to "Company A," it reiterated that the

company had only "casually" approached Boston Private and suggested, "subject to numerous contingencies, it <u>might</u> consider a valuation at a tangible book value multiple in a general price range of $10.50." <u>Id.</u> And as to the subsidiary, Boston Private reiterated that its suggested premium had an implied transaction value of less than what SVB was proposing at the time, a price that Boston Private had concluded was inadequate.

### IV.   <u>The Independent Proxy Advisor Recommendation</u>

On April 14, 2021, Boston Private issued a press release announcing that independent proxy advisory firm Institutional Shareholder Services (ISS) had recommended shareholders vote for the merger, with DeChellis opining, "This recommendation underscores that the transaction with SVB Financial is financially and strategically compelling and provides the best path for maximizing value for Boston Private shareholders." Dkt. 26-7 at 2. Boston Private did not make the report itself available to shareholders.

The next day, HoldCo issued soliciting materials characterizing the ISS report as "cautionary." Dkt. 26-8 at 4 ("ISS's rare 'cautionary support' recommendation for the Merger gives significant credence to the concerns we have expressed. Further, in its report ISS makes numerous points that would seem

to support a vote against the Merger."). HoldCo quoted the report extensively, most notably its conclusions:

> Our analysis points to several conclusions: 1) Is the deal opportunistic? Probably, as evidenced by the valuation gap between the two companies when the deal was struck. <u>2) Can the buyer afford to pay more, as the dissident suggests? Most likely, given the size of the transaction relative to SIVB's market cap, the benefits of the deal for the acquirer, and possible levers, such [sic] the current lack of any TBV earnback period. 3) Is the immediate downside risk of rejecting the deal material? Probably not,</u> as evidenced by the recent appreciation of the index and relevant peers. <u>Given these factors, certain shareholders may opt to reject the transaction as a limited-risk option to elicit an improved offer.</u>

<u>Id.</u>

### V. <u>The Fair Value of the Merger</u>

DeChellis and SVB's CEO began discussing a joint venture in March 2020, and continued discussions privately through May 2020, keeping others at Boston Private out of the talks until May 26, 2020, and not actually informing the Board until July 21, 2020. The Board was informed about SVB's interest not by DeChellis, but by representatives of SVB conducting due diligence for a potential transaction. Boston Private claims the Board then negotiated the final price.

After a deal was struck, Boston Private's proxy solicitations focused on the nominal value of the merger, touting that "[t]he Board negotiated to increase the value of the value of the merger

consideration from approximately $7.60 per Boston Private share to $10.94 per Boston Private share." Dkt. 23 ¶ 4.

But HoldCo publicly argued in its March 25 Proxy Amendment that Boston Private had actually negotiated for lower consideration, telling shareholders, "In early September 2020, SVB's offer implied an all-stock ratio of 0.0365 SVB shares per BPFH share, more than 20% higher than the January 4, 2021 all-stock exchange ratio of 0.0282." Dkt. 26-5 at 5. HoldCo argued, "SVB effectively used its increasing share price to reduce the number of shares it would have to issue to BPFH shareholders." Id.

Boston Private presented the merger as a "compelling premium," of 56 percent above the Company's unaffected share price before the announcement. Dkt. 23 ¶ 4. HoldCo disagreed. Its March 25 Proxy Amendment warned that Boston Private's share price on the day of the merger announcement, $8.39, represented "an 11% discount to liquidation value and a 52% discount to the Company's five-year median tangible book value multiple of 1.84x, making it one of the lowest valued banks of its size nationwide." Dkt. 26-5 at 4. HoldCo also argued that SVB's stock was overvalued compared to historical norms, citing SVB's own filings to illustrate that SVB's gains are "volatile" in nature and "not necessarily indicative of [its] expected performance in a future period." Id. at 5. HoldCo opined, "Therefore, the so-called premium SVB is offering BPFH

shareholders is nothing more than a mirage borne out of BPFH's pandemic stock underperformance." Id. at 4. Boston Private disparaged HoldCo's opinions in a press release as "misguided" and full of "sleights of hand." Dkt. 26-6 at 10–11.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

A plaintiff bringing a private action arising under the Securities Exchange Act must comply with the pleading requirements of the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4. In an action alleging misleading statements and omissions, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(8)(1). And "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate [the Securities Exchange Act] caused the loss for which

the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(8)(4).

## ANALYSIS

Plaintiff alleges the proxy statements contain half-truths and material omissions.[2] "To prevail on a claim under Section 14(a) and Rule 14a-9, the plaintiff must prove a "misstatement or omission was material" and "the proxy solicitation itself . . . was an essential link in the accomplishment of the transaction" that caused plaintiff's injury. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 444 (1976) (citing 17 C.F.R. § 240.14a-9). There is "no need to demonstrate that the alleged defect in the proxy statement actually had a decisive effect on the voting." Id. A misstatement or omission is "material" if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Id. at 449. Materiality does not, however, "require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote." Id. The First Circuit has explained, "As far as proxy statements are concerned . . ., the federal purpose is served if the statement fully and fairly

---

[2] Because this Court finds no material defect in the solicitations, it does not reach the arguments on loss causation.

sets out such relevant and material facts as would enable a reasonably prudent shareholder to make an intelligent decision as to whether to grant the requested proxy or as to how he should vote on the questions mentioned in the proxy statement." Lessler v. Little, 857 F.2d 866, 875 (1st Cir. 1988) (quoting Golub v. PPD Corp., 576 F.2d 759, 762–63 (8th Cir. 1978)).

As a threshold matter, the parties dispute whether HoldCo's proxy solicitations can be considered part of the "total mix" of information for the materiality analysis. The total mix of information available to shareholders includes information outside the proxy solicitations that was widely known in the market. See Thant v. Karyopharm Therapeutics, Inc., __ F.4th __, 2022 WL 3134028 (1st Cir. August 5, 2022) (quoting Baron v. Smith, 380 F.3d 49, 57 (1st Cir. 2004) ("It is not a material omission to fail to point out information of which the market is already aware.")); Backman v. Polaroid Corp., 893 F.2d 1405, 1420 (1st Cir. 1990) ("[T]he reasonable investor would not consider withheld information to be important if it were already widely known to the market."); Jackvony v. RIHT Fin. Corp., 873 F.2d 411, 415 (1st Cir. 1989) (considering materiality in light of "general knowledge" in the banking community that banking laws would soon change).

The total mix of information available to a shareholder also includes information outside of the proxy statement where the information is already in the public domain and readily available to shareholders. See United Food and Com. Workers Union Local 880 Pension Fund v. Chesapeake Energy Corp., 774 F.3d 1229, 1238 (10th Cir. 2014) (holding that a Form 8-K was readily available on the SEC website and a reasonable investor interested in a company's swap practices would know to look at prior 8-K disclosures). But the investor needs to have had a reasonable basis to look for the information in publicly available reports outside the proxy statement before the outside information can be considered as part of the total mix of information. United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1199 (2d Cir. 1993) (holding that a reasonable shareholder voting on a proposal who had read both the proxy statement and the annual report would have received no indication that additional information was available in the 10-K report).

Additionally, the "reasonable availability" of outside information to investors does not include every piece of information an investor could collect through effort—a board of directors cannot, for example argue that shareholders should have called the company and asked for additional information. See Shaev v. Saper, 320 F.3d 373, 381 (3d Cir. 2003) ("That an investor could hypothetically conduct research to clarify ambiguities and

discover omissions in the proxy statement does not relieve the Board of its obligations under Rule 14a-9.")

"While a proxy is not normally required to contain matter contained in other materials which are furnished and which are clearly referred to in the proxy, a company soliciting proxies may not obviate violation of the disclosure requirements by referring to materials furnished by its opponents in a proxy contest." Gladwin v. Medfield Corp., 540 F.2d 1266, 1270 (5th Cir. 1976) (citing Kohn v. Am. Metal Climax, Inc., 458 F.2d 255, 265 (3d Cir. 1972), overruled on other grounds by Kershner v. Mazurkiewicz, 670 F.2d 440, 448 (3d Cir. 1982) ("[A]ny otherwise material violation of the disclosure rules is not obviated by referring to materials of an opposing soliciting party.")).

Nevertheless, investors have been expected to have knowledge of publicly available SEC filings since 1996 when the SEC required domestic public companies to file electronically. Kaplan v. First Hartford Corp., 447 F. Supp. 2d 3, 8 (D. Mass. 2006) (citing In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 374 n.6 (E.D.N.Y. 2003)).

This dispute involves a contentious proxy battle in which HoldCo and Boston Private were publicly engaged in debate. HoldCo's communications were referenced in the Boston Private solicitations, were filed with the SEC, and were readily available

to shareholders through the EDGAR system on the SEC's website. A shareholder would be putting on blinders to not consider the readily available information on the website that were at the heart of the proxy fight. See In re Keyspan Corp. Securities Litig., 383 F. Supp. 2d 358, 373 (E.D.N.Y. 2003) ("[I]n today's world it is unrealistic to argue that documents available on the SEC website are not readily accessible to the investing public."); Lone Star Steakhouse & Saloon, Inc. v. Adams, 148 F. Supp. 2d 1141, 1144 (D. Kan. 2001) ("[T]he court deems any SEC filings distributed because all filings are readily available to the public both through the Internet and other media."). In this setting, under the case law, the publicly available communications from HoldCo are part of the total mix of information available to the reasonable investor.

## I.    **Statements about the Interest of Other Parties**

Plaintiff accuses eight statements of being materially false and misleading, three as to the interest of other parties:

> I.   That DeChellis and Boston Private had closed the door on incoming interest from the CEO of First Foundation Wealth Management ("First Foundation"), because "Boston Private had previously determined that such a transaction would not be financially attractive or create meaningful value for Boston Private shareholders, and that this company was not a strong financial, cultural, or strategic fit for Boston Private [and that] [a]ccordingly there was no reason to engage in further discussions . . . ." Boston Private Shareholder Letter & Proxy Solicitation, p. 4 (Apr. 7, 2021)

16

II.  That First Foundation's "apparent interest was in
being acquired by Boston Private," rather than interest
in a dialogue about a merger. (Id.)

III. That "no . . . institution, other than SVB
Financial, ever submitted a proposal regarding a
potential acquisition or strategic business combination
to Boston Private." Boston Private Definitive Proxy, p.
61 (Mar. 18, 2021).

Dkt. 23 ¶ 4. In essence, Plaintiff argues that these statements
omit the continued outreach from FFWM; omit that FFWM was
interested in a merger, not just an acquisition; and mislead as to
why there were no proposals, given that DeChellis impeded such
proposals by refusing to seriously engage with other interested
institutions.

As outlined above, Boston Private disclosed the facts of its
interactions with all three companies. In fact, the proxy
explicitly disclosed FFWM's continued outreach. See Dkt. 26-1 at
59 ("The California-based company's Chief Executive Officer
continued to periodically reach out to Mr. DeChellis from time to
time in an effort to gauge whether Boston Private's views towards
a transaction might have changed."). And even if Kavanaugh's email
about his interest in a "merger" could be interpreted to express
interest in more than just being acquired by Boston Private, Boston
Private's statement that he was primarily interested in the
acquisition did not change the total mix of information,
particularly given that HoldCo had made the email available to

shareholders. Shareholders could interpret the email themselves. And the proxy disclosed that DeChellis told the companies that Boston Private was not interested. See, e.g., Dkt. 26-1 at 61 (noting that DeChellis said "that the board was not specifically pursuing a sale of the company at that time").

Plaintiff is unpersuasive in arguing that these disclosures, or lack thereof, misleadingly painted the three parties as unserious in their offers. The total mix of information available to shareholders, largely through Boston Private's own proxy solicitations, was sufficient to allow shareholders to reach their own conclusions. See New England Anti-Vivisection Soc., Inc. v. U.S. Surgical Corp., Inc., 889 F.2d 1198, 1202 (1st Cir. 1989) ("[F]ederal law is satisfied as long as the proxy materials fully and fairly set forth the relevant and material facts from which a reasonable shareholder may draw his own conclusions as to how to vote."). "Fair accuracy, not perfection, is the appropriate standard." Id. (quoting Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d 1195, 1200 (2d Cir. 1978)).

## II.  **Statements about the Proxy Advisor Recommendation**

Plaintiff accuses two statements of being materially false and misleading as to the third-party proxy advisor recommendation:

> IV.  That the independent proxy advisory company Institutional Shareholder Services had "recommend[ed] that Boston Private shareholders support the

> recommendation of [Boston Private's] Board and vote in favor of the merger with SVB Financial." Boston Private Press Release & Proxy Solicitation (Apr. 14, 2021)
>
> v. That ISS's report "underscore[d] that the transaction with SVB Financial [was] financially and strategically compelling and provide[d] the best path for maximizing value for Boston Private shareholders." (Id.)

Dkt. 23 ¶ 4. Plaintiff argues that Defendant's nondisclosure of ISS's negative observations was unlawful.

Plaintiff argues that once Defendants touted the positive recommendation, they were required to disclose the negative observations within the recommendation. The claim that Boston Private's description of the ISS recommendation was a half-truth is plausible. However, HoldCo made the negative observations available to shareholders, and they were part of the total mix of information available to shareholders during the proxy battle. Cf. Burkle v. OTK Associates, LLC, 2 F. Supp. 3d 519, 524 (S.D.N.Y. 2014) (noting that the "misleading effect" of a company's press release about an ISS recommendation "was dissipated and counteracted" by news articles that "supplied the 'total mix' of information that their press release omitted").

III. **Statements about the Fair Value of the Merger**

Plaintiff accuses three statements of being materially false and misleading as to the fair value of the merger:

19

VI.  That "[t]he Board negotiated to increase the value of the merger consideration from approximately $7.60 per Boston Private share to $10.94 per Boston Private share at the date of announcement of the transaction[.]" Boston Private Shareholder Letter & Proxy Solicitation, p. 4 (Apr. 7, 2021)

VII. That the merger provided shareholders a "compelling premium" that had "substantially increased since [December 31, 2020] as a result of the appreciation of SVB Financial's share price, [. . .] corresponding to a 56% premium to Boston Private's unaffected share price as of immediately prior to announcement[.]" (Id.)

VIII. That "[t]he Board believe[d] that the transaction with SVB Financial provide[d] substantially higher and more certain value to Boston Private shareholders than the company's available alternatives." (Id.).

Dkt. 23 ¶ 4. Plaintiff argues that these statements mislead by focusing on the nominal value and omitting the fact that the implied exchange ratio decreased over the course of negotiations. In Plaintiff's view, the exchange ratio was not fair because Boston Private and SVB stocks were under- and over-valued, respectively.

As to the alleged omissions, again, the Court need not parse whether, as Defendants argue, the drop in exchange ratio was a "conclusion [that] is obvious to anyone conversant with elementary mathematics." Data Probe Acquisition Corp. v. Datatab, Inc., 722 F.2d 1, 5 (2d Cir. 1983). Once again, additional disclosure would not have altered the total mix of information available to shareholders; HoldCo had already made the exchange ratio public knowledge, along with its calculations of both companies' actual values. While shareholders might give more weight to the opinions of the Board, which owes them a fiduciary duty, the facts

underlying HoldCo's opinions, released to shareholders, were already reasonably likely to be considered by shareholders. There was no material omission or misrepresentation as to the sixth and seventh statements.

With respect to the eighth statement, Plaintiff argues Defendants did not genuinely believe this was the best option, highlighting that DeChellis and the Board had previously touted the Company's financial performance and prospects and that the ISS evaluation cautioned that a higher price likely could have been achieved. He points out that DeChellis rebuffed outside interest because he stood to personally gain from a deal with SVB. Here, the question is of subjective sincerity:

> For a statement of opinion, the plaintiff must plead that the statement falsely represented the speaker's belief at the time it was made (i.e., that the speaker did not sincerely believe the statement) and that it was untrue; that a statement of fact embedded within the opinion is untrue; or that the speaker omitted material facts that would make the statement misleading to a reasonable investor.

Miller Investment Trust v. Morgan Stanley & Co., LLC, 308 F. Supp. 3d 411, 429 (D. Mass. 2018)(citing Omnicare, Inc. v. Laborers Dist. Council Const. Ind. Pension Fund, 5757 U.S. 175, 189-92 (2015)). Plaintiff has not stated a plausible claim that the Board or DeChellis did not sincerely believe the SVB deal was the best option available to Boston Private—the evidence it cites does not plausibly belie the sincerity of the belief.

**ORDER**

After hearing, for the reasons stated above, the Court **ALLOWS** Defendants' Motion to Dismiss (Dkt. 24).

SO ORDERED.

/s/ PATTI B. SARIS
Patti B. Saris
United States District Judge